## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN C. REX, | ) | CASE NO. 3:20-cv-1663 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G.CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |

Plaintiff, Shawn C. Rex ("Plaintiff" or "Rex"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

## I.   PROCEDURAL HISTORY

On May 16, 2017, Rex filed an application for POD, DIB, and SSI, alleging a disability onset date of September 30, 2016, and claiming he was disabled due to COPD, heart problems, 2 heart attacks, seizures, and sleep apnea.  (Transcript ("Tr.") at 227, 234, 281.)  The applications were denied initially and upon reconsideration, and Rex requested a hearing before an administrative law judge ("ALJ").  (Tr. 168-9.)

On April 5, 2019, an ALJ held a hearing, during which Rex, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 40-76.)  On May 29, 2019, the ALJ issued a written decision finding Rex was not disabled.  (*Id*. at 16-37.)  The ALJ' s decision became final on May 27, 2020, when the Appeals Council declined further review.  (*Id*. at 1.)

On July 28, 2020, Rex filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.)  Rex asserts the following assignment of error:

> (1)   The ALJ failed to properly account for Mr. Rex's admittedly severe epilepsy disorder. The ALJ's failure to properly consider the extent of this impairment led to the creation of an inaccurate residual functional capacity.

(Doc. No. 15 at 2.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Rex was born in 1974 and was 42 years old on the alleged disability date, making him a "younger" individual age 18-44 under social security regulations.  (Tr. 29.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has at least a high school education and is able to communicate in English.

(*Id.*)  He has past relevant work as a rough carpenter, finish carpenter, carpentry supervisor and nailing machine operator.  (*Id*.)

**B.      Relevant Medical Evidence**[2]

      **1.          Mental Impairments**

On July 19, 2016, Rex sought treatment from Amy Freeman, LISW, at Gene Wright Community Health Center ("GWCHC") to establish care for a history of recurrent depression.  (Tr. 375.)  He reported most recently becoming highly depressed three years ago, related to the end of a relationship, job loss due to his seizures, and loss of his home, following which he "'holed up' in his mother's garage and drank daily."  (*Id.*)  He was now drinking less and addressing his physical health that he previously neglected.  (*Id.*)  Rex reported he had received court-ordered counseling in the past, but he still did not know how to manage anger and stress.  (*Id.*)  He reported "sharing a 1/2 gallon of 'whatever' and a case of beer with friends on weekends," and smoking marijuana daily to calm down and sleep.  (*Id.*)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, questionable judgment, some insight, normal affect, and euthymic mood.  (*Id*. at 376.)

On October 10, 2016, Rex reported to Freeman he had been having seizures and was on Keppra, and was reducing his alcohol intake, although he reportedly had eight beers in one day during the prior week.  (*Id*. at 392.)  He reported that conditions, including seizure disorder, were "somewhat controlled," yet he continued to have having a mix of depression, anxiety and agitation,

---

    [2]      The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

and was not sleeping well.  (*Id*. at 392-3.)  Freeman discussed a prescription for Depakote.  (*Id*. at 393.)

On October 24, 2016, Rex reported to Freeman that he had increased mood swings during his first week on Depakote, as well as "a lot of situational stress" and that "not working is main trigger to his depressed feelings."  (*Id*. at 401.)  He reported that a neurologist imposed work restrictions, and that he had not been able to pay child support and was facing the threat of jail time.  (*Id.*)  Rex reported his mood had stabilized, and he had fewer seizures and less desire for alcohol on Depakote.  (*Id.*)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, normal judgment and insight, tearful affect, and depressed mood.  (*Id*. at 402.)   Freeman discussed increasing Depakote and adding Requip.  (*Id.*)

On January 9, 2017, Rex reported to Freeman that with the increased dose of Depakote, he was "more motivated," and "less irritable," but he was still feeling anxious and panicky at times.  (*Id*. at 415.)  He asked Freeman for another medication for his anxiety, and the social worker discussed Chantix.  (*Id.*)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, questionable and maladaptive judgment, normal insight, normal affect, and euthymic mood.  (*Id*. at 416.)

On June 13, 2017, psychiatrist Young Wung  Rhee, M.D., wrote a letter stating that he had been seeing Rex since April 6, 2017, for diagnoses including dysthymia, panic disorder, cyclothymic disorder, marijuana use, history of alcoholism, and personality disorder not otherwise specified.  (*Id*. at 471.)  Dr. Rhee mentioned that Rex reported being depressed all his life, had never required in-patient treatment, and described Rex's history of treatment as well as alcohol and marijuana use. (*Id.*)

4

Dr. Rhee added Effexor XR to Rex's medications, advised him to see a counselor, and return to see him in two months. (*Id.*)

On July 21, 2017, Rex reported to Freeman that his depression continued "mostly due to inability to work with his uncontrolled seizures, fatigue from all of the meds he takes preventing him from doing anything, and child support 'breathing down my neck.'" (*Id*. at 702.)  He stated that he "hasn't been able to obtain actual documentation that he can't work, despite being taken off work by either his neurologist or cardiologist."  (*Id.*)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, normal judgment and insight, tearful affect, and depressed mood.  (*Id*. at 703.)

On August 31, 2017, Rex reported to Freeman that he "went manic," didn't sleep, felt "on top of the world," went on an alcohol binge, and stopped taking medications for a week and a half, but had restarted the day before and felt that, while he was still anxious, he was sleeping and his mood was becoming more stable.  (*Id*. at 721.)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, questionable judgment, lacking insight, normal affect, and euthymic mood.  (*Id*. at 722.)

On October 2, 2017, Rex was evaluated by consultative psychologist Michael Wuebker, Ph.D.  (*Id*. at 637.)  He reported that he was filing for Social Security disability on the advice of his family doctor. (*Id.*)  He reported having seizures, heart problems, anxiety, and depression. (*Id.*)  He reported he last worked in October of last year until the job ended because of seizures.  (*Id*. at 638.)  He mentioned that he sought work since then but had not obtained a job.  (*Id*. at 639.)  Rex reported having about seven seizures in the past month.  (*Id*. at 639.)  Rex lived with his mother and his teenage nephew, and described his daily activities as watching television, napping, reading,

interacting with his two small dogs, playing video games, making simple meals, performing light cleaning tasks though he tired quickly, and shopping for brief periods while leaning on a cart.  (*Id*. at 641-2.)  He reported that one friend visited him twice a month, and he went fishing with another friend about once a week.  (*Id*.)  Dr. Wuebker observed Rex was clean and neat, with clear and understandable speech, logical and coherent thought content, appropriate affect, and no symptoms of anxiety or depression.  (*Id*. at 640.)  Rex "demonstrated marginally adequate insight and ability to make common sense judgments," and average cognition.  (*Id*. at 641.)  Dr. Wuebker opined Rex had an unspecified bipolar disorder and anxiety disorder, and cannabis and alcohol use disorders. (*Id*. at 642.)  He opined Rex had no functional limitations, but would need help managing any funds awarded due to his substance use disorders.  (*Id*. at 642-3.)

On October 12, 2017, Rex reported to Freeman that he was feeling more depressed, hopeless, and frustrated with his health issues, the disability process, and his relationship status, as well as sleeping more and lacking motivation to do things like go out into the garage to work on and organize his car. (*Id*. at 730.)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, normal judgment and insight, tearful affect, and depressed mood.  (*Id*. at 731.)

On July 10, 2018, Rex reported to Freeman that he had been living in a tent on a friend's property and at times staying with family members, and had not been taking some of his medications because they made him "too tired and he cannot afford this with being homeless."  (*Id*. at 1061.)  He mentioned that all of his "specialists are upset that he is not taking his meds" and that he was "still awaiting disability." (*Id*.)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, normal judgment, insight,

and affect, and unremarkable mood.  (*Id*. at 1062.)

On January 23, 2019, Rex reported to Freeman that his neurologist did not want to see him until testing was completed.  (*Id*. at 1414.)  Freeman noted that Rex was in good spirits, had gained significant weight over the past year, and reported that he was awaiting housing and meanwhile staying with his mother.  (*Id*.)  He reported continuing to smoke one to two marijuana joints every other day, but that he had not been drinking alcohol. (*Id*.)  He said he was trying to follow through on the neurological testing, and had requested a therapist. (*Id*.)  On examination, Freeman noted Rex was well-groomed, cooperative, and calm, with clear speech, logical thought processes, average intelligence, questionable judgment, normal insight and affect, and euthymic mood.  (*Id*. at 1415.)

### 2.      Physical Impairments

On June 6, 2016, Rex presented to the emergency room after he reported an episode in which he was "backing out of his car" and then experienced "[t]ime where he just doesn't remember what happened and he ended up in the parking lot cross street from his house. Patient said yesterday he had a 1-minute episode where he felt disconnected from his body like he was awake but he couldn't control himself. The patient was shaking and couldn't move his arms, but he was awake."  (*Id*. at 520.) Rex denied having "anything like this before." (*Id*. at 520.) An evaluation showed normal results, and Rex was advised to follow up with a neurologist and to establish care with a primary care provider. (*Id*. at 521.)

On June 24, 2016, Rex re-established care with Warren Morris, M.D., at GWCHC.  (*Id*. at 366.)  He reported that he "has been having episodes where he just goes blank, stares, doesn't respond to anyone."  (*Id*. at 367.)  Dr. Morris referred Rex for neurology and cardiology consultations.  (*Id*. at 369.)

7

On July 19, 2016, Rex returned to Dr. Morris to follow up on his history of mild chronic obstructive pulmonary disease ("COPD").  (*Id.* at 371-72.)  Dr. Morris noted Rex used ProAir and Symbicort inhalers to control is COPD, and had no change in baseline symptoms since his last visit. (*Id.*)  On examination, his breathing was unlabored, and breath sounds were normal.  (*Id.* at 373.) Dr. Morris recommended Turdoza therapy and smoking cessation, and advised Rex to follow up with the asthma clinic in six weeks.  (*Id.*)

On August 8, 2016, Rex returned to Dr. Morris for follow-up regarding his cardiology issues and seizures.  (*Id.* at 378.) Dr. Morris noted that Rex was not able to get recommended cardiology testing due to lack of insurance, and had an appointment for a neurological consultation on August 31. (*Id.*)

On August 23, 2016, Rex had a cardiology consultation, and reported shortness of breath that worsened with activity.  (*Id.* at 577.)

On August 31, 2016, Rex saw Ali S. Almudallal, M.D., for an evaluation of "altered awareness," which began two months prior.  (*Id.* at 345.)  Rex's girlfriend described that he had staring spells two to three times daily, during which he was unresponsive and had associated right hand shaking, which lasted two to three minutes. (*Id.*)  After these spells Rex experienced confusion for a couple of minutes.  (*Id.*) Rex reported that he was not driving, had no shortness of breath or chest pain, and no vision changes.  (*Id.* at 346.)  Dr. Almudallal recommended evaluation at an epilepsy clinic, and meanwhile prescribed Keppra.  (*Id.* at 348.)  Noting Rex's reports of difficulties handling stress, Dr. Almudallal noted it was questionable whether Rex was having epileptic versus non-epileptic events. (*Id.*)  He advised Rex to avoid alcohol; and not to drive, swim, operate heavy machinery, or have exposure to compromising heights until he was event free for six months.  (*Id.*)

On September 22, 2016, Rex returned to Dr. Morris for treatment of bilateral leg pain.  (*Id*. at 382.)  Dr. Morris noted that Rex was scheduled for a sleep study that night, and had been prescribed medication by both his cardiologist and neurologist. (*Id*.)

On October 10, 2016, Rex sought care from GWCHC Nurse Practitioner Courtney Baller, and reported struggling with depression "severe panic attacks and social anxiety." (*Id*. at 388.)  His leg pain was gone.  (*Id*.)  He requested a referral for a functional capacity evaluation. (*Id*. at 387.)

On October 24, 2016, Rex reported to Nurse Baller that the first week taking Depakote he was more emotional and had increased mood swings, but now returned to his normal mood and he thought the dose was not strong enough. (*Id*. at 396.)  Rex said that "[n]eurology told him he shouldn't be working so he has been off for several months."  (*Id.*)

On November 8, 2016, Rex reported to Nurse Baller that his seizures were becoming more severe but not more frequent.  (*Id*. at 405.)  He reported now passing out and urinating on himself during some of these episodes.  (*Id.*)  He had not contacted neurology but stated that he would.  (*Id.*)

On November 18, 2016, Rex called Dr. Almudallal's office to report that he had a seizure six days ago and that his episodes were becoming more severe and now associated with urinary incontinence. (*Id*. at 344.) When asked whether he followed up with the previously issued epilepsy evaluation referral, Rex responded that he did not have the money to make the trip to that facility and asked what could be done locally.  (*Id.*)  A nurse at Dr. Almudallal's office repeatedly tried to reach Rex by telephone to advise Rex that he needed to be evaluated at an epilepsy clinic and that this could not be done locally, but was unable to contact him.  (*Id.*)

On January 9, 2017, Rex reported to Nurse Baller that his seizures were improving and that he was "in the process of being referred back to the epilepsy center now that he has insurance."  (*Id*.

9

at 410.)  Rex reported doing well on Depakote and Requip.  (*Id.*)  Nurse Baller observed that he appeared "slightly anxious but much improved from prior to the Depakote." (*Id.*)

On February 23, 2017, Rex saw Dr. Almudallal, and reported he still experienced episodes of shaking spells and altered awareness.  (*Id*. at 340.)  He reported that shaking spells were more frequent and that he would experience them while sleeping and that he would wake up incontinent, and that his body shook during sleep for 15 to 20 seconds.  (*Id*. at 342.)  He reported taking Keppra regularly, and was no longer consuming alcohol. (*Id.*)  Dr. Almudallal increased Rex's Keppra dosage and indicated that otherwise they would need to wait for the epilepsy clinic evaluation. (*Id.*)

On May 10, 2017, Rex reported to Nurse Baller that he was taking a lot of medications every day and now felt tired and slept 16 hours a day. (*Id*. at 418-9.) He mentioned that he was seeing a psychiatrist and that "psych has him off of work right now and he has applied for disability."  (*Id*. at 419.)  He reported he had scheduled an epilepsy clinic evaluation at the end of the month, and that his neurologist "will not label his seizures until he sees this clinic."  (*Id*.)

On May 19, 2017, Rex sought evaluation of his seizures at RHC Neurology Clinic.  (*Id*. at 429.)  He reported that he had seizures since July 2016. (*Id*. at 431.)  He described them as altered awareness and amnesic periods.  (*Id*.)  His girlfriend mentioned that  he would often wake her up at night with shaking of his right arm and leg and occasional urination.  (*Id*.)  He also had staring episodes where he did not respond to people around him, which occurred about once a week or three times a month, were triggered by stress, and were not associated with any aura.  (*Id*.)  The episodes lasted about 30 seconds, following which Rex experienced confusion for two to three minutes. (*Id*.) Rex also reported weakness, numbness, seizures, dizziness, and frequent and severe headaches.  (*Id*. at 432.) The examining provider observed that, apart from anxiety, Rex's examination was nonfocal.

10

(*Id*.) The provider recommended increasing Depakote, continuing Keppra, and that Rex undergo a magnetic resonance imaging study of the brain and a sleep deprived electroencephalogram ("EEG"), and if that was non-diagnostic Rex might need a Long-Term Monitoring for Epilepsy ("LMTE") evaluation because seizures were occurring about three times a month. (*Id*.) The provider recommended seizure precautions, no driving, no tub bathing alone, and no swimming alone. (*Id*.)

On June 12, 2017, Rex reported to Nurse Baller that a neurologist told him his seizures were stress-induced.  (*Id*. at 691.)  The visit otherwise focused on discussing mental health medications, as well as a painful mass Rex noticed over the weekend after he did a lot of lifting and rowing in a canoe. (*Id*.)

On July 21, 2017, Rex reported to Nurse Baller that he was scheduled to see a neurologist in August, and that he continued to have seizures but "they don't want to increase the Keppra because it may increase his agitation."  (*Id*. at 697.)

On July 25, 2017, Rex was evaluated for physical therapy, and reported that he had a diagnosis of epilepsy, had grand mal seizures resulting in falls and absence seizures, and that as a result he was unable to work.  (*Id*. at 478, 482.)

On August 18, 2017, Rex reported to Nurse Baller that he was being threatened with jail due to inability to pay child support, which he could not pay due to not being able to work, and that he needed "a provid[er] to write him off work" and that his neurologist and cardiologist told him to see primary care for a note.  (*Id*. at 712.)

On August 31, 2017, Rex reported to Nurse Baller that a couple of weeks ago he had been manic, started drinking every day, and stopped all his medications, and again stated that neurology and cardiology told him he could not work but had not given him an off-work note.  (*Id*. at 717.)

11

Nurse Baller issued a note the same day, stating that Rex "has been taken off work by Neurology and Cardiology specialists," and "is unable to return to work until further notice due to medical conditions." (*Id*. at 1407.)

On September 19, 2017, Rex reported to his pulmonologist that he was "on disability because of his seizures and is eager to return to work." (*Id*. at 889.) He reported that he "had no recent seizure activity and is due to see a new neurologist tomorrow at his request." (*Id*.)

On September 28, 2017, Rex saw Dr. Gerald T. Riess at a ProHealth neurology clinic. (*Id*. at 1232.) Rex reported having six seizures per month, with the most recent occurring two weeks prior to his visit. (*Id*. at 1232-33.) Notes state that Rex's wife provided much of the history[3] and described that Rex would jerk his right arm and leg at night and would then be unresponsive, and that he sometimes had staring spells or falls during the day. (*Id*. at 1233.) Dr. Riess diagnosed partial symptomatic epilepsy with complex partial seizures, intractable, without status epilepticus, and indicated that he would try to obtain the results of the previous neurological evaluation. (*Id*. at 1232.) Dr. Riess recommended increasing Depakote. (*Id*.)

On October 12, 2017, Rex reported to Nurse Baller that he was still having breakthrough seizures, but that his prescription for increased Depakote still had not "ma[de] it to the pharmacy." (*Id*. at 725.)

On October 23, 2017, Rex reported to Dr. Riess that he had no concerns. (*Id*. at 1225.) He reported having a breakthrough seizure after only three days on the medication, specifically at night "with enuresis as the only evidence." (*Id.*) Dr. Riess observed that Rex's Depakote level was sub-

---

[3]     Notes state Rex "is accompanied by his wife, who provides much of the history." (Tr. 1233.) Elsewhere in the record, it does not appear that Rex was married at this time.

12

therapeutic and his Keppra level was below detectable, and noted that typically it took "5 days to reach steady state." (*Id.*)  Dr. Riess assessed that Rex's complex partial epilepsy symptoms were under borderline control and advised him to return in a month. (*Id.*)

On December 6, 2017, Rex reported to Dr. Riess that he continued to have several seizures per month, and also had leg twitching movements at night.  (*Id*. at 1216.)  Dr. Riess noted that Rex's seizures were poorly controlled and prescribed Lamictal.  (*Id.*)

On January 9, 2018, Rex reported to Nurse Baller that he stopped all medications about three weeks ago "because he felt as though he could no longer function with them, was sleeping all day, and his legs were jumping."  (*Id*. at 1042.)

On January 17, Rex reported to Dr. Riess that he had discontinued his medications and then restarted them, with some seizures in the interim, and also that after restarting a lower dose of Effexor he had not had the jerking movements at night, though he stated that he had seizures at night but was not sure how often.  (*Id*. at 1212.)  Dr. Riess noted that Rex's symptoms had "been exacerbated by poor compliance with his medication," and recommended restarting and potentially increasing Lamictal.  (*Id*.)

On January 19, 2018, Opportunities for Ohioans with Disabilities ("OOD") determined that Rex was eligible for vocational rehabilitation services, with a priority category of "Most Significantly Disabled" and limitations in functional areas of self-direction, mobility, and work tolerance, but not in communication, self-care, interpersonal skills, or work skills.  (*Id*. at 1287.)

On February 26, 2018, OOD closed Rex's case.  (*Id*. at 1284.)  The notice stated that the case was closed based on "Health/Medical" reason, and elaborated that Rex "told OOD that you want to work in . . . an extended employment site . . . for example, a sheltered workshop" and that he "stated

13

that you do not want to work toward getting a job in the community with others who are not disabled."  (*Id*.)

On March 13, 2018, Rex returned to Dr. Riess, and reported that his last seizure was "roughly a month ago."  (*Id*. at 1208.)  He reported that he had some breakthrough seizures when he lost his medication for more than a week while moving to a new house.  (*Id*.)  Dr. Riess opined that Rex's symptoms were poorly controlled due to poor compliance with medication. (*Id*.)  Dr. Riess noted that he would refer Rex to an epilepsy monitoring unit if Rex still had breakthrough seizures despite medication compliance and advised him to return in three months. (*Id*.)

On June 13, 2018, Rex reported to Dr. Riess that he had been homeless and had not taken his medications for a few weeks for logistical reasons, and had multiple seizures. (*Id*. at 1200.) He had been on Keppra and Depakote for about two weeks and reported continuing to have seizures once to twice a week.  (*Id*. at 1200-01.)  Dr. Riess noted that Rex's symptoms were very poorly controlled, in significant part based on poor compliance with medication, and referred Rex to an epilepsy monitoring unit.  (*Id*. at 1200.)  Dr. Reiss referred Rex to an epilepsy monitoring unit for diagnostic testing to determine if he had seizures or non-epileptic spells.  (*Id*. at 1343.)

On July 9, 2018, Rex reported at a sleep medicine appointment that he was currently not working due to seizures, that he had lost his job and was not able to afford medications, and that he had more seizures but was also much more alert.  (*Id*. at 879.)  The doctor advised Rex that he needed to resume his medications.  (*Id*. at 883.)

On July 10, 2018, Rex had an appointment for medication refills, and reported to Nurse Baller that he had "been manic due to being off of most of his meds." (*Id*. at 1055-56.)  He reported that "[h]e saw neurology in June, they want to do brain surgery to remove scar tissue but will not

move forward with anything until he restarts his meds." (*Id*. at 1056.)  On examination, Rex had normal, intact judgment and insight, normal mood, and appropriate affect. (*Id*. at 1059.)

On August 27, 2018, Rex sought care at the emergency room for complaints of lower back pain, which he thought might have started due to seizures he experienced while asleep. (*Id*. at 1002.)

On September 5, 2018, Rex again sought care at the emergency room for complaints of shortness of breath and anxiety; he reported that he felt like he was about to have a seizure and during the examination was shaking in bed but alert, oriented, and conversant. (*Id*. at 1014.)  Rex reported that he had stopped taking medications "because he didn't have a ride to Lima to refill them," and mentioned that his medications were "free through Health Partners." (*Id*. at 1023.)  On discharge the impression was that Rex had a panic attack. (*Id*. at 1020.)

On October 16, 2018, Rex told Nurse Baller that he continued to have issues, including with seizures, and was unable to tolerate his medications. (*Id*. at 1065.)  He reported taking Depakote and Prozac, but not Effexor because it made him tired, and that he was feeling very anxious and had episodes of mania. (*Id*.)  He reported having transportation issues, including that "insurance will not transport him further than 30 miles." (*Id*.)

On November 1, 2018, Rex saw another doctor at the same neurology clinic as Dr. Riess for complaints of low back pain.  (*Id*. at 911-12.)  A referral form on the same day with Dr. Riess's name circled referred Rex to an epilepsy monitoring unit. (*Id*. at 958.)

On December 4, 2018, Rex again sought care from the neurology clinic, but treatment notes did not discuss seizures. (*Id*. at 908-09.)

On December 11, 2018, the facility to which Rex was referred for the epilepsy monitoring unit issued a note to Dr. Riess stating that Rex "has indicated that he or she will call at a later time

15

to arrange this appointment" and that he was not currently scheduled for any services. (*Id*. at 955-57.)

On December 20, 2018 the epilepsy monitoring  facility issued another note, stating that two attempts to reach Rex by telephone had been unsuccessful, and that they mailed a letter asking Rex to call them to schedule an appointment.  (*Id*. at 921.)

On January 23, 2019, Rex reported to Nurse Baller that he had received housing and would be moving soon. (*Id*. at 1409.)  He reported that he was taking mental health medications and that his mood was well-controlled. (*Id*.) He reported that he "still hasn't had his neurology testing completed" and that he was experiencing three to six seizures a week. (*Id*.)

On April 30, 2019, Rex returned to Dr. Riess, who noted that he last saw Rex about a year ago.  (*Id*. at 1418.)  Rex had not completed epilepsy monitoring unit testing.  (*Id*.) Rex reported continuing to have multiple seizures, markedly poor compliance with medications during manic episodes, and still having two to six seizures a month even during good compliance. (*Id*.)  Rex reported that he was continuing to take Depakote and Keppra, and that his last seizure was three days prior to the appointment. (*Id*.)  Rex requested "a letter stating how many times per month he reports having seizures."   (*Id*.)  Dr. Riess increased the Keppra dose, ordered testing for the Depakote levels, and advised Rex to return in three weeks or a month. (*Id*.)

C.    **State Agency Reports**

1.    **Mental Impairments**

On October 5, 2017, State agency psychological consultant Katherine Reid, Psy.D., reviewed the record and opined that Rex had no limitations in his ability to understand, remember and apply

16

information; mild limitations in his ability to interact with others and concentrate, persist, or maintain pace; and moderate limitations in his ability to adapt or manage himself. (*Id*. at 86.)  She opined Rex "retains the ability to perform in a routine work setting where significant changes in job duty can be explained in advance to allow for adequate adjustment." (*Id*. at 91.)

On January 23, 2018, State agency consulting psychologist Kristen Haskins, Psy.D., reviewed the record and concluded the record supported the initial administrative findings.  (*Id*. at 122-3.)

### 2.      Physical Impairments

On November 14, 2017, State agency medical consultant Lynne Torello, M.D., reviewed the record and opined that Rex was capable of functions congruent with a range of medium work.  (*Id*. at 88-90.)  Dr. Torello opined that Rex had the following functional limitations:

- • never climb ladders, ropes, or scaffolds;

- • avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, and gasses; and

- • avoid all exposure to hazards including unprotected heights, hazardous machinery, and commercial driving. (*Id*.)

Dr. Torello noted that Rex had absence seizures but had gone on drinking spells and stopped his medications.  (*Id*. at 90.)

On January 24, 2018, State agency medical consultant Elizabeth Das, M.D., reviewed the record and concurred with Dr. Torello's previous assessment.  (*Id*. at 125-27.)  While Dr. Das noted that Rex reported increased seizure activity, and reported he sometimes took the wrong dose or mixed up his medications, she opined that the overall evidence still supported Dr. Torello's previous assessment.  (*Id*. at 126.)

D.      **Hearing Testimony**

During the April 5, 2019 hearing, Rex testified to the following:

- He lives alone in Lima, Ohio.  He has been at that address 3 weeks, and was previously living "here and there," mostly in a tent.  (Tr. 46.)

- He receives food stamps, and assistance with utilities, and has had health coverage at all times since September of 2016.  (*Id*.)

- He last worked in September of 2016, as a working foreman.  The job required he lift up to 150 pounds.  (*Id*. at 47.)

- Prior to that, he worked as a "change-out" man at Rubber Manufacturing, primarily repairing pallets.  He knew every job there, and could replace other people.  The job required he lift up to 100 or 150 pounds.  (*Id*. at 48-9.)

- He loved working construction.  He's very good with his hands and really pays attention to details. He's done both rough and finish carpentry, and his work always stands out.  (*Id*. at 51.)

- He has seizures 4-6 times a month, that he knows of.  He doesn't always know when he's had one, because they often happen in his sleep.  He will wake up on the floor or in his own urine.  Afterwards, he is "just lost and out of it" for a day or a day and a half.  He stays in bed and pretty much sleeps.  It is hard for him to remember what happens during that time.  (*Id*. at 52.)

- He takes Keppra and Depakote for his seizures.  He is usually compliant, but sometimes has a manic episode, which can last for days.  During this time, he goes off his medication, can't sleep, and cleans or reorganizes things over and over. He has manic episodes a couple of times a month sometimes, and sometimes not at all. (*Id*. at 52-3.)

- He can't tell when a seizure is coming.  Sometimes he has staring spell seizures, and sometimes he has full clonic seizures.  He has never tried to count the staring spell seizures because he doesn't know when they are happening.  (*Id*. at 53-4.)

- He has a valid driver's license, but hasn't driven since September 2016 due to his seizures.  He gets rides from his case worker and his girlfriend.  (*Id*. at 54-5.)

- He doesn't take public transportation because of his social anxiety.  (*Id*. at 55.)

- He relies on his girlfriend to go grocery shopping with him, go to medical appointments with him, and handle his medications.  (*Id*. at 56-8.)

18

- His therapist resigned, and he has been asking for a new one, because therapy helped a lot.  (*Id*. at 60.)

- 20 minutes of walking in the grocery store tires him.  He needs to take breaks and lean on the cart.  (*Id*. at 62.)

- When he took all his medications as prescribed, he slept all day.  He gained weight and lost mobility.  Now that he has stable housing, he is able to control his food and be more active.  (*Id*. at 63.)

- His medications make him feel sick and sleepy, and he still has unpredictable seizures.  These prevent him from working.  (*Id*. at 64.)

Rex's girlfriend also testified, explaining that she had known Rex for about 4 years, and saw him about every other day.  (*Id*. at 65.)  She fills his medications and makes sure he has taken them.  (*Id*. at 66.)  She needs to remind him to take the medications about every two weeks, and he has manic episodes where he forgets to take his medication about monthly.  (*Id*.)  She last witnessed a shaking seizure about 2 weeks ago, in the evening.  (*Id*. at 67.)  The next morning, he couldn't remember what day it was, or keep track of the time, stared blankly, and was very confused.  (*Id*.)  This state lasts about 24 hours, until he gets another night's sleep.  (*Id*.)  During this time, he doesn't shower, dress, or prepare food for himself.  (*Id*.)  She observes these seizures about twice a month, and observes the aftermath of a seizure about two or three times a month.  (*Id*. at 68.)

The VE testified Rex had past work as a rough carpenter, finish carpenter, and carpenter supervisor.  (*Id*. at 70-1.)  The ALJ then posed the following hypothetical question:

> [A]ssume an individual of the claimant's age, education, and vocational background with the ability to perform a full range of work at the medium exertional level except no climbing ladders, ropes, or scaffolds; no exposure to extreme cold or heat, wetness or humidity. No exposure to concentrated fumes, odors, dust, and gases; no exposure to unprotected heights or dangerous moving machinery; no commercial driving. And the individual requires a work routine that is repetitive from day to day with few and

19

expected changes. Would such an individual be capable of performing any of the claimant's past work?

(*Id*. at 71.)

The VE testified the hypothetical individual would not be able to perform Rex's past work as a rough carpenter, finish carpenter, and carpenter supervisor.  (*Id*.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaner, hand packager, or assembler.  (*Id*. at 72.)

The ALJ amended the hypothetical to add the following limitations:

[T]he individual is further reduced to work at the sedentary exertional level.

The individual is capable of understanding, remembering, and carrying out only simple tasks that are not fast paced, meaning the pace of productivity is not dictated by an external source over which the individual has no control.

The individual can tolerate occasional interaction with coworkers, but should have no interaction with the public, and limited to a work routine that is repetitive from day to day with few and expected changes. Are there jobs at the sedentary exertional level such an individual could perform?

(*Id*. at 72.)    The VE explained the hypothetical individual would be able to perform representative jobs such as assembler, inspector, hand packager, and office helper.  (*Id*. at 72-3.)

The VE testified that the tolerance for being off task would be no more than ten percent of the time, not including any scheduled break periods.  (*Id*. at 73.)  For unscheduled absences, the tolerance would be no more than two per month, and after about ten unscheduled absences, a person would have difficulty maintaining employment.  (*Id*.)

In response to questioning from Rex's counsel, the VE agreed that if an individual is having two grand mal seizures under either of the hypotheticals, or had two large seizures a month that leave him that day and most of the next day incapable of getting to work, being at work, or completing

20

work in any ordinary sense of the word, that would prevent competitive employment.  (*Id*. at 74.)
Smaller staring seizures would be problematic because they cause off-task time and loss of
productivity.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time
of disability and must prove an inability to engage "in substantial gainful activity by reason of any
medically determinable physical or mental impairment," or combination of impairments, that can
be expected to "result in death or which has lasted or can be expected to last for a continuous period
of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he
became disabled; and (3) he filed while he was disabled or within twelve months of the date the
disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk
v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a
claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 & 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of
a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc.
Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First,
the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the
time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant
must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20
C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . .

21

physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Rex was insured on his alleged disability onset date, September 30, 2016, and remains insured through December 31, 2017, his date last insured ("DLI.")  (*Id*. at 21.)  Therefore, in order to be entitled to POD and DIB, Rex must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirement of the Social Security Act through December 31, 2017.

2.      The claimant has not engaged in substantial gainful activity since September 30, 2016, the alleged onset date.

3.      The claimant has the following severe impairments: chronic diastolic heart failure; hypertension; coronary artery disease; chronic obstructive pulmonary

22

disease (COPD); obstructive sleep apnea; seizure disorder; obesity; degenerative disc disease; restless leg syndrome; bipolar disorder; anxiety disorder; alcohol use disorder; cannabis use disorder; and cigarette nicotine dependence.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except no climbing ladders, ropes, or scaffolds; no exposure to extreme cold or heat, wetness, or humidity; no exposure to concentrated fumes, odors, dusts, and gases; no exposure to unprotected heights and dangerous moving machinery; no commercial driving; capable of understanding, remembering, and carrying out simple tasks that are not fast-paced meaning the pace of productivity is not dictated by an external source over which he has no control; occasional interaction with coworkers; no interaction with the public; and limited to a work routine that is repetitive from day to day with few and expected changes.

6.     The claimant is unable to perform any past relevant work.

7.     The claimant was born on **, 1974, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.     The claimant has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2016, through the date of this decision.

(*Id*. at 21-30) (citations omitted).

23

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d

24

1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Rex asserts that the ALJ erred by adopting a determination of residual functional capacity ("RFC") that omits any accommodation for his severe epilepsy and the associated limitations resulting from that impairment.  (Doc. No. 15 at 7.)  He argues that the ALJ improperly discredited

the severity of Rex's epilepsy because he concluded that Rex was "largely non-compliant" with his medication, but failed to consider the reasons for Rex's non-compliance as required by Social Security Ruling 16-3p.  (*Id.* at 8.)  He also argues the ALJ erred by failing to explain how Rex's "admitted severe epilepsy impacts his ability to work within the residual functional capacity."  (*Id.* at 9.)

The Commissioner responds that the ALJ's RFC determination appropriately accounts for any credibly established functional limitations.  (Doc. No. 17 at 17.)  She notes the ALJ's RFC determination is "overall more restrictive" that the RFC determinations recommended by the State agency reviewers, and Rex does not identify any medical sources who assessed greater limitations.  (*Id.* at 17-18.)  She argues that the ALJ did not err by failing to rely on Rex's subjective reports of symptoms, and asserts the record as a whole supports the ALJ's conclusion that Rex had varied reasons for not complying with his medication regimen, the majority of which were unconnected to any type of mental health diagnosis.  (*Id.* at 19.)  Further, she argues that because Rex's seizure episodes were "precipitated by transient episodes of medication noncompliance, they did not reflect a condition that would be longitudinally disabling over a period of at least 12 months."  (*Id.* at 20.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.946(a).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96  8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon

26

which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him."). *See also* SSR 96  8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ identified epilepsy as one of Rex's severe impairments.  (*Id*. at 21.)  At step three, the ALJ concluded that Rex did not meet or medically equal the listing relating to epilepsy, listing 11.02, because the listing required that seizures persist at specified frequencies over a period of no less than three months despite compliance with treatment.  (*Id*. at 23.)  The evidence of record, including the testimony of Rex[4] and Rex's girlfriend,[5] established that Rex had not been consistently compliant with treatment for a three month span during the relevant period. (*Id*.

---

[4]  Rex testified "I go manic and I go off my meds. . . .  a couple of times a month sometimes, and sometimes not at all."  (Tr. 53.)

[5]  Rex's girlfriend, who Rex testified manages his medications, explained that he Rex usually doesn't miss medication unless he is "goes on those manic episodes," and stated: "I would say he goes through the manic episodes about monthly, but probably about every two weeks I have to remind him to take his medication." (Tr. 66.)

at 66.)  At step four, the ALJ explained further:

> Although the claimant alleged at the hearing that his seizures are of listing-level severity, the undersigned disagrees because seizures appear to be precipitated largely by non-compliance with treatment.  Treatment notes indicate that non-compliance with medication contributed to seizures.  By the claimant's own admission at the hearing, he did not take medication as prescribed, especially when manic.

(*Id*. at 26-7.)  The only RFC limitations that the ALJ linked to Rex's epilepsy were as follows:

> He is limited to no exposure to unprotected heights and dangerous moving machinery and no commercial driving in light of seizures, fatigue associated with obstructive sleep apnea, and the side effects of medication.

(*Id*. at 27.)  Finally, the ALJ again raised the issue of non-compliance with treatment in the final

paragraph of his step four analysis:

> [W]hen compliant, treatment was effective in alleviating symptoms.  Notably however, the claimant was not always compliant with treatment, as he would not take epilepsy medication consistently, and he abused drugs, alcohol, and cigarettes, which directly contributed to symptom exacerbation.

(*Id*. at 28.)

Rex argues that his non-compliance with treatment was the result of another severe

impairment recognized by the ALJ: bipolar disorder.  (Doc. No. 15 at 8.)  He asserts that the ALJ

erred by failing to evaluate the cause of his non-compliance as required by Social Security Ruling

16-3p,[6] which states that the Commissioner "will consider and address reasons for not pursuing

treatment that are pertinent to an individual's case. [The Commissioner] will review the case to

---

[6]     The Social Security Agency rescinded SSR 96-7p and replaced it with SSR 16-3p, which is applicable to agency decisions issued on or after March 28, 2016. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). SSR 16-3p therefore applies to the ALJ's decision issued in this case on May 29, 2019.  *Kirkhart v. Comm'r of Soc. Sec.*, No. 1:18-CV-241, 2019 WL 2314860, at *7 (S.D. Ohio May 31, 2019), report and recommendation adopted, No. 1:18CV241, 2019 WL 4727373 (S.D. Ohio Sept. 27, 2019)

28

determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

The Commissioner acknowledges the ALJ did not provide such an analysis, but argues that it was not necessary because "while the ALJ acknowledged that episodes of medication noncompliance were attributable in part to manic episodes, Plaintiff's argument overstates what the record evidence actually shows. There were a few instances where Plaintiff described feeling manic and not taking his medications, but the longitudinal record shows that he gave varied reasons for not complying with his medication regimen, the majority of which were unconnected to any type of uncontrollable manic episodes attributable to any actual diagnosis."  (Doc. No. 17 at 19) (internal citation omitted).

A review of the ALJ's decision, however, establishes that the only basis the ALJ articulated for finding that the seizures did not satisfy the requirements of listing 11.02 was because "[t]reatment notes indicate that non-compliance with medication contributed to seizures.  By the claimant's own admission at the hearing, he did not take medication as prescribed, especially when manic."  (Tr. 27.) She also acknowledged that Rex had a severe impairment of bipolar disorder, and manic episodes are a symptom of that impairment.  Yet the ALJ does not address the relationship between the severe impairments of bipolar disorder and epilepsy, even though she explicitly stated that Rex's non-compliance with treatment was at least partially a result of his bipolar disorder.  It is undisputed that when Rex was not compliant with medication, he experienced frequent seizures.

The Sixth Circuit has cautioned that an ALJ "must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state" since the "very failure

to seek treatment" can for some be a "symptom of the disorder itself." *White v. Comm'r of Social Security*, 572 F.3d 272, 283 (6th Cir. 2009) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (listing cases that recognize a mentally ill person's noncompliance with treatment "can be ... the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (citations, internal quotation marks, and brackets omitted)). *See also* SSR 63-p, 2017 WL 5180304, *10 (a claimant with a mental impairment "may not be aware that he or she has a disorder that requires treatment.")    The Commissioner cannot cure a deficient opinion by offering explanations that were not offered by the ALJ.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn*, No. 5:12CV2355, 2013 WL 3967282 at * 8; *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, No. 1:10  CV  02936, 2012 WL 253320 at *5 (N.D. Ohio Jan. 26, 2012).  Here, the argument now advanced by the Commissioner was not articulated by the ALJ as reasons for failing to discuss the impact of Rex's bipolar disorder on his medication compliance.  The ALJ did not conclude that a "majority" of Rex's periods of non-compliance "were unconnected to any type of uncontrollable manic episodes attributable to any actual diagnosis."   (Doc. No. 17 at 19.) Accordingly, this Court must reject this *post hoc* rationalization.

Further, even assuming, *arguendo*, that the ALJ had addressed the extent to which Rex's mental health impairments contributed to Rex's non-compliance, the ALJ's decision also does not acknowledge or address the other stated reasons why Rex was intermittently non-compliant with medication.   The record indicates that financial barriers and the impact of side effects also

discouraged Rex from regularly taking certain prescribed medications.  These issues also should be addressed under SSR 16-3p.  The regulation promises "We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  It identifies numerous reasons which may be considered, including:

- An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.[7]

- An individual may not be able to afford treatment and may not have access to free or low-cost medical services.[8]

SSR 16-3p.  The record reflects Rex was sometimes non-compliant with medications for reasons that fall within both of these categories, and the ALJ failed to acknowledge or address these issues in her decision.  The Commissioner asserts that SSR 16-3p does not "categorically prohibit" the ALJ's reasoning.  (Doc. No. 17 at 20.)  However, the issue in this case is not that the ALJ reasoned badly, it is that the ALJ's reasoning is unclear.  This case requires remand because the Court cannot determine to what extent the ALJ considered Rex's mental impairment as a mitigating factor in his medication non-compliance, nor whether she considered the deterrent effects of financial limitations or disabling side effects at all.

---

[7]    Here, Rex complained that he could not take all his prescribed medications because they left him so fatigued that he slept 16 hours a day or more.  (Tr. 418-9, 702, 1042, 1061.)

[8]    Here, Rex explained he could not afford his medications once he became homeless.  (Tr. 879, 1200, 1061.)  He repeatedly stated he did not have the money to travel for an out-of-town epilepsy evaluation, although his neurologist deemed this essential.  (*Id*. at 344.)  He also explained that although he could get some medication free through his clinic, he could not afford to pay for a ride to get there. (*Id*. at 1023.)

31

The regulations require that the ALJ "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Here, the ALJ has acknowledged that Rex's mental illness contributed to non-compliance with treatment, but did not explain how this affected her RFC analysis.  Further, she failed to acknowledge the obstacles to compliance created by financial hardship and medication side effects.  "If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."  *Shrader*, 2012 WL 5383120, at *6.  In this case, the Court cannot provide meaningful review of the ALJ's decision because discussion of critical factors was omitted.

The Commissioner also argues that because Rex's seizure episodes were "precipitated by transient episodes of medication noncompliance, they did not reflect a condition that would be longitudinally disabling over a period of at least 12 months."  (Doc. No. 17 at 20.)  However, this is another *post hoc* rationale, as the issue is not raised in the ALJ's decision.    Further, the Commissioner cites no evidentiary basis for this assertion.

The ALJ's decision acknowledges that Rex had frequent seizures, but determined they were not of "listing-level severity" because "seizures appear to be precipitated largely by non-compliance with treatment."  (Tr. 26-7.)  Given the critical role of non-compliance in the ALJ's decision, the omission of any discussion of the mitigating factors set forth in SSR 16-3p requires remand.  The Court cannot offer meaningful appellate review of a decision that omits discussion of evidence directly relevant to the determination of disability.  Therefore, the Court should vacate and remand the decision to afford the ALJ the opportunity to explain her consideration of the mitigating factors

for non-compliance with treatment as set forth in SSR 16-3p .

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be Vacated and Remanded for Further Consideration Consistent with this Opinion.  On remand, the ALJ should explain her consideration of the mitigating factors for non-compliance with treatment as set forth in SSR 16-3p .

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 25, 2021


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).